We'll begin with argument in Whitehurst. Good morning, your honors. My name is William Prentiss Yarrow. It's a pleasure to be here. I'd like you to know my client is present with her husband. Helen, could you just raise your hand? And I thank the two law students for giving up their seats. I also have my assistant, Cassandra White. Very helpful. Thank you. Your honor, your honors may please the court. We feel that we have pleaded a case under the Human Rights Law in New York. The way it works in New York is, like every other discrimination case, it begins with a prime aphasia case. In federal law and state law, that's a very minimal burden. In New York, there just has to be enough evidence so that an inference can be drawn that the adverse employment action is related to some protected category, such as disability, in this case. Was disability known at the time of the dismissal? No, it was not. It's not important because we are relying on the Figueroa versus Foster case, which deals with discrimination during the grievance slash arbitration process. So, generally speaking . . . So who's your claim against, then, in that regard? It's against both the both the hospital and the union. The better case is against the union because there is precedent for it. Figueroa versus Foster decided shortly before we made the decision to arbitrate based upon disability. And the evidence of that is that they know she's disabled, that they are going out of their way not to help her in this case. I had to take a very unusual step, something I've never had to do in my career, that is to go to the NLRB and ask them to force a union just to simply file a grievance. It's a very easy thing to do. And we went through that whole process and the NLRB was going to discipline them if they didn't. So they agreed to do it. So they filed a grievance. So this is an organization that, in my view, is really going out of their way not to help my client. So the is the evidence that sustains the claim that that's disability discrimination, which is, I understand it, how you're characterizing or posturing the claim in this case? Well, let me just tell you this. In all the years I've been doing this, I've never had anybody admit that they're discriminating. So it's done circumstantially in most cases, the vast majority of cases. We go back to what's the source of the knowledge that the parties, your client is alleged, you're alleging on behalf of your client, discriminated against? I wrote a letter. I sent them a letter after dismissal and saying she has sleep apnea and here are the medical records. And I didn't get medical, I didn't go to a doctor after she got fired. We had records before she was fired. The doctor said she has chronic obstructive sleep apnea and that it will cause brief instances of somnolence. I never heard of that word before, but I looked it up and it means you're going to fall asleep at work. So, and that's a diagnosis that predates determination. So they knew she was disabled. And a union's job is to help people, and this is a very minor form of misconduct. I realize it's misconduct to probably one of the worst forms of misconduct, but when it's explained by an illness, then it's not so bad. So they knew. And you, are you saying that they they were, that the union was, was, was discriminated against her because of her sleep apnea? Yes. Why would that, how does that hang, what's the evidence for that? Well, as I said, no one's going to admit these things. Well, of course. And, and that's not evidence. But what we do in these cases, they have the, it was set up in the McDonnell Douglas case several years ago, in recognition that it's hard for us to prove these cases. There's a very minimal burden called the I've shown you how they're going out of their way not to help her. I've alleged also that for very minor forms of misconduct, very few people are terminated the first time in a union, in a union. Very few people are terminated. And we learned that through discovery. She told me that. Other people have told me that. I'm familiar with this hospital. I've represented other people. I know they have a form of progressive discipline. It's, it's just not a case they would normally terminate somebody. But didn't she fall asleep on successive days right after she started? No. December 10th. Oh, in the new job? Yes. The new job. Two successive days, briefly nodding off. She wasn't sleeping under the desk. She wasn't sleeping in the lunchroom. She wasn't sleeping out in the parking lot. And I've had cases like that. But it was briefly nodding off. She was at her post. She was at her post. There was a brief, listen, I'm not saying she wasn't working. She was at a post. There was a brief lull in the work. She doesn't dispatch ambulances for a living. She doesn't drive a train for a living. I realize falling asleep is a problem. But when it's explained by an illness, you have to take that into consideration. This is really not a case they would normally terminate somebody. That's just what we've alleged. And what were her duties as a telecommunications operator? What was she doing? Staten Island University Hospital has two branches. They have a north and a south. So sometimes they have to transfer patients from one place to the other. And she arranges that. It's just arranges transportation from one facility to another. It's not like an emergency. It's not a 911 call. That's what she does. So we feel we've alleged enough to create the inference of discrimination. So the way it works in New York and in federal court, then the burden shifts to the defendants to come up with a legitimate reason for the termination. So before you get off that counsel, yes. Take me back at least, please. To what you assert is sufficient evidence that the hospital knew that your client had a disability that was the basis for their discrimination? The initial termination, they had no idea at that time. All right. So that termination is not based on discrimination? Is not? We're giving them a complete pass on that, Judge. Evidence of discrimination. They're okay on that. I wrote a letter. I sent it Federal Express to the hospital and the union and I said, this woman has sleep apnea and you really can't fire her. You have to do something else. And I also sent it to the union. I said, you have to grieve this. This is not something you could ignore. And they ignored me. And then we went to, I'm sorry. And as to the hospital, that's what made them aware? Yes. And then? Well we alleged, well we went to the NLRB. The NLRB forced the union to file a grievance. We did the grievance. A grievance is a very short thing. It's just, you know, you and the, you reconsider it, you present the information, and then the hospital could say, okay, you can come back or you're still fired. So they kind of read, they look at it all over again. And in this case, they said, no, we don't care if you have sleep apnea. We don't care if you're disabled. You're still fired. That's it. Now did they say that? No, they didn't say that. But that's, that's the result of it. They knew she was disabled. She had this disability. They were on notice from you that she had sleep apnea. Yeah. Are you saying that therefore they had to rehire her? There's a causation gap here. You say that she was fired, and I understand. I, it's not a lack of compassion for a woman who has sleep apnea. It's a serious affliction. And it's serious to be fired because you have that kind of affliction. But the firing was over when, when all of this started. And the firing was not because of sleep apnea, because they didn't know that she had sleep apnea. They didn't know. So you know, I understand the problem. But what were they supposed to grieve? Because they didn't hire her back? I don't understand what, what, what the union was, what its position was supposed to be if you can see that she was fired, not fired inappropriately. A union is supposed to fight for people. That's one. Figueroa v. Foster states that unions are not allowed to discriminate in the grievance and arbitration process. That case specifically states that one of the, one of the plaintiffs in that case alleged that the union did not go to arbitration based upon a protected characteristic. We don't know what it was. Can I ask you this about, at some point in your briefs where you say that the CBA required a suggestion of other suitable employment too. Are you pursuing that, that they should have found her a different position? What I'm saying there is that initially the hospital and the union stated that, in other words, their grounds for termination initially were, you're probationary, you're gone. And I said, well, no, you're wrong. She's not really a probationary worker. She's been with the union for seven years. So when you're probationary in a new job, but not probationary as in the union, you can't just throw somebody away. Am I relying on that? No, I'm relying on the human rights law. But what I am stating is that if they offer that as a defense, it's wrong. And when we went to the NLRB the second time to deal with the, the union's failure to arbitrate, in other words, we went a second time to the NLRB to force the union to arbitrate, they stopped alleging that the client was probationary because they knew if they persisted with that, they would have been disciplined. So they changed their theory at the 11th hour to we found, we found a document from the hospital that states, if you fall asleep at work, we can fire you. I mean, I'm not surprised that that's the policy everywhere. It's the law clerks falls asleep, you're going to fire them. So my time's running out. So I had a red light, but thank you. It looks like I'm over the time. Thank you very much. Thank you. Thank you, counsel. We'll hear from Mr. Bauer. Good morning. May it please the court. Nicholas Bauer representing Northwell Health, Staten Island University Hospital and Melissa Ham. Now, as, uh, counsel for the appellant described, uh, the appellant Helen Whitehurst was terminated for sleeping on the job in December of 2014. She concedes that she didn't tell her employer that she was sleeping due to a medical condition until almost a month after she was fired. Now, eventually the union grieved the decision to terminate her employment and the hospital denied the grievance based on her probationary status. Now the appellant asserts that this gives rise to claim for disability discrimination under state and city human rights laws, but the district court properly determined that her claims are preempted by section 301 of the labor management relations act. So her probationary status, uh, puts her in a category where she has far fewer protections under the CBN, correct? Yes, that was the position that the hospital took during the grievance process. Uh, now she contested that, uh, based on her assertion that she had a right to reinstatement to an alternate position under the CBA. Uh, these questions, uh, require interpretation of the collective bargaining agreement and under the Supreme court's decision in all Alice Chalmers, uh, that establishes that when any claim for element of a plaintiff's claim for relief requires the interpretation of a collective bargaining agreement, that claim is preempted by section 301 of the labor management relations act. And her claims depend on the interpretation of the collective bargaining agreement to the extent that a court or an arbitrator would to resolve her claims need to determine whether she was properly classified as a probationary employee who could be terminated for any time, whether she was entitled to be reinstated to an alternate position despite her probationary status, whether she was entitled to be terminated only for just cause, whether sleeping on the job warranted application of the principles of progressive discipline and whether she was entitled to a DeNovo review of her termination during the grievance and arbitration procedures, all of which are controlled by the CBA, all of which would be require interpretation of the, of the CBA and are controlled by the CBA. I didn't see the CBA in our, in our papers. Is there some reason for that? I was not one of the record in the district court proceedings. So how do we know what you just said is true, that we have to look to those particular provisions, uh, to, to be interpreted for a LIMRA preemption? Well, that, that appears from the face of plaintiff's complaint. She asserts that the hospital denied the grievance on the basis of her probationary status. So it's clearly reflected on the face of her complaint that there is some dispute between the parties as to the proper interpretation of the collective bargaining agreement. There is no right under the state and city human rights laws, uh, or no precedent under the state and city human rights laws that requires employers to excuse an employee's past misconduct based on an after the fact disclosure of the individual's disability. Uh, she argues that the hospital was required to do this, to basically excuse her past misconduct because of her disability based on the grievance and arbitration procedure provided by the CBA. Now, whether in fact the CBA provided that right to her, uh, whether or not the CBA required the hospital to essentially reconsider the decision to fire her as if it had known she was disabled at the time it made the decision to fire her. That's a question of collective bargaining and agreement and interpretation. Well, it may very well be it would have been helpful to have seen the CBA provisions that you're talking about though, but I guess that's as much for the union lawyer as it is for you, right? I mean, we're talking about limer, uh, preemption and you have to look at the particular provisions of the CBA to see whether that really applies or not, but it's kind of hard to do so without the CBA. Certainly determining what, I would agree that, uh, your honor that interpreting the CBA, um, determining whether or not the CBA, uh, pardon me, that determining what plaintiff's rights under the collective bargaining agreement requires looking at the CBA. Maybe an easier solution is, is, is this not really disputed, it seems among the parties that there are CBA provisions, except maybe for the arbitration provision that seems to be in dispute a bit, but that there are particular CBA provisions that affected the relevant terms of employment for the plaintiff, right? Right. And I apologize, but as to, you know, why the court doesn't need to look into, yes, um, the parties agree that there is a CBA, that the CBA governs the plaintiff's rights under the collective bargaining agreement or the CBA governs the plaintiff's rights in the context of the grievance and arbitration procedure. Now the plaint, and the plaintiff alleges that the parties disagree as to what her rights and entitlements were under the collective bargaining agreement, or at least the allegations in the complaint reflect that there is a disagreement among the parties about what those rights and entitlements were. So the fact that the parties are disputing the meaning of the collective bargaining agreement, the court, uh, to determine whether or not plaintiff has a claim in the first instance, the court is going to be required to interpret the disputed provisions of the collective bargaining agreement that plaintiff alleges uh, entitle her to be reinstated to her position. And I'm out of time and the balance of the Eppley's time. They're in the complaint. Pardon? They're in the complaint, right? What are in the, my pardons, the allegations in the complaint, yes. Thank you. Thank you. Mr. Wissinger? Good morning. May it please the court, my name is Micah Wissinger. I represent Defendant Eppley, 1199 SEIU, and it's President George Gresham. The district court wrote a well-reasoned and detailed decision here that answers the narrow question before this court, whether the complaint was pled as a hybrid section 301 DFR claim or whether it was pled under state anti-discrimination law. In ruling on the motion to remand, uh, with respect to 1199, Judge Ross found that there are no factual allegations in the complaint that provide even minimal support for the assertion that 1199 discriminated against her. Um, she also found, uh, that even if the complaint had stated a plausible claim for relief against the union, it was one for breach of the duty of fair representation, and no matter how that, uh, was labeled, it's a claim that arises under federal law. Uh, there were questions about, there were statements made regarding the, the, the evidence of discrimination. There were no factual statements in the complaint that provided any expression of anti-disability bias, nor was there any allegation of, of, or any provision of any circumstantial evidence, just simply nothing in the complaint but a bare bones assertion that discrimination had occurred. Um, plaintiff argues that the discrimination occurred because she had a meritorious grievance that did not go to arbitration, and making that conclusion, as you heard, uh, from the plaintiff fully, Judge Droney, the, there are two things at play here for why, I guess, we don't have the contract in the record. First, I would point you to the appendix. It's page 25 through 27. It's the letter that counsel sent, uh, to notify the union and the employer that his client was disabled, and that was a month after the termination. That's a three-page, single-spaced letter, and there are two sentences in there that is a detailed march through the contract, through the CBA, and counsel himself, putting those, those provisions of the contract in play, so to speak. Um, and second, Judge Ross was dealing with a time-barred DFR claim. Once counsel was, was, was aware that his claim was in federal court, he abandoned it, uh, and, and, and in his paper said he preserved, you know, his rights for appeal, but he did not, he, he, it was not a foregone conclusion, and, and Judge Ross said that in her motion to remand that, uh, in the, excuse me, in the dismissal, that he could have still argued the DFR, and he abandoned that, so there was no need to get into this, because on its face, uh, it was in federal court, and those words, lateral transfer, probation, uh, uh, layoff, they are rich with meaning, um, and to the point, uh, just to address it briefly, of, of the union going out of its way, uh, as some kind of evidence, look, there was a good-faith dispute here as to whether plaintiff was entitled to access the grievance machinery. So, uh, we are stuck with the record we have, uh, and plaintiff has pled that, you know, that the NLRB forced, uh, forced the union's hand. It doesn't matter, because it is a federal claim, uh, and there is a good-faith dispute between the parties as to what the contract provides, and that's why Judge Ross, uh, said this case, uh, needed to be in federal court. On the question of Figueroa, um, this is simply not the case for debating the finer points of Section 301 preemption and reaching the conclusions that the Figueroa court declined to reach. Uh, a fair reading of Figueroa is that a state and city can adopt more strenuous protections than the DFR and anticipate enforcing that, except where doing so requires an interpretation of the contract, and that's the problem we have here. This case, uh, requires interpretation of the contract. Uh, Figueroa spoke about a floor provided by the DFR and a ceiling, uh, against invidious discrimination provided by state and local law. This case doesn't come close to meeting the floor or the ceiling. Um, she simply never pled a claim for invidious discrimination, and in looking very closely at the complaint, Judge Ross stated that although, you know, she put those words in there, uh, to say that this was a claim for discrimination, there are, quote, no factual allegations in the complaint that provide even minimal support for the proposition that 1199 discriminated against her. Our review is de novo here, is it, because it's a motion to dismiss? It is, yes. I asked a question. Yes, it is. I don't know that that changes much, but, uh, uh, I asked a question. Yes, sir. It's not for abuse of discretion. No, no, it is not. It is not. It is not. But Judge Ross did correctly conclude that under the artful pleading doctrine, uh, the plaintiff's claim raised a federal question, uh, and it required interpretation of the collective bargaining agreement. The complaint was properly removed to federal court and thereafter dismissed as a time bar DFR claim. And in the, in the collective bargaining agreement, did the 1199 retain some discretion as to whether to proceed to arbitration? Uh, that's not a function of the collective bargaining agreement. That's a function of federal law. Supreme court, well-established Supreme court precedent, Vacaville, Sipes, O'Neill and its progeny that a union maintains the, uh, the ability to, to, to only take meritorious cases. And in fact, the complaint pleads that, that in this instance, this particular union has a, by its own constitution and bylaws, a process for a second level of review. Plaintiff pled that her case went to that second level deliberative body, which ruled that the case didn't have a merit to move forward in arbitration. Thank you. Review of that. If there is review at all, a federal question or review of the union's internal process? Yes. Yes. Or it's traditional DFR. Okay. Thank you, Mr. Weisinger. Thank you. Thank you. All of you. Um, we'll take this case under advisement. Have a great day. You too.